**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **THE ASSOCIATED PRESS; GANNETT SATELLITE INFORMATION NETWORK LLC d/b/a USA TODAY; and VICE MEDIA LLC,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**FEDERAL BUREAU OF INVESTIGATION,**<br><br>**Defendant.** | **Case No. 16-cv-1850 (TSC)** |

**<u>PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiffs The Associated Press, Gannett Satellite Information Network LLC d/b/a/ USA TODAY, and Vice Media LLC hereby move for entry of summary judgment in their favor pursuant to Federal Rule of Civil Procedure 56(a). The bases for this motion are set forth in the accompanying Memorandum of Points and Authorities in Support of Plaintiffs' Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment, Statement of Material Facts as to Which There is No Genuine Dispute, and the Declaration of Jay Ward Brown and the exhibits thereto. Pursuant to Local Rule 7(f), Plaintiffs request oral argument. A proposed order is also filed herewith.

Dated:  February 20, 2017
        Washington, D.C.

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

Of Counsel:

Karen Kaiser
Brian Barrett
The Associated Press
450 West 33rd Street
New York, NY 10001
Telephone: (212) 621-7547
Fax: (212) 506-6131
E-mail: kkaiser@ap.org
E-mail: bbarrett@ap.org

Barbara W. Wall
Thomas Curley
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107
Telephone: (703) 854-6417
Fax: (703) 854-2031
E-mail: bwall@gannett.com
E-mail: tcurley@gannett.com

By:    /s/ Jay Ward Brown
       Jay Ward Brown (D.C. Bar No. 437686)
       1899 L Street, N.W., Suite 200
       Washington, D.C. 20036
       Telephone: (202) 508-1136
       Fax: (202) 861-9888
       E-mail: jbrown@lskslaw.com

       Jeremy A. Kutner
       (*Admitted Pro Hac Vice*)
       321 West 44th Street, Suite 1000
       New York, NY 10036
       Telephone: (212) 850-6100
       Fax: (212) 850-6299
       E-mail: jkutner@lskslaw.com

*Counsel for Plaintiffs The Associated Press, USA
TODAY, and Vice Media LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of February, 2017, I caused the foregoing Plaintiffs'

Cross-Motion for Summary Judgment, the Memorandum of Points and Authorities in Support of

Plaintiffs' Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for

Summary Judgment, the Statement of Material Facts as to Which There is No Genuine Dispute,

the Declaration of Jay Ward Brown and the exhibits thereto, and Proposed Order, to be filed and

served electronically via the Court's ECF system upon all counsel of record.


Dated: February 20, 2017                         _____/s/ Jay Ward Brown_____
                                                 Jay Ward Brown

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **THE ASSOCIATED PRESS; GANNETT SATELLITE INFORMATION NETWORK LLC d/b/a USA TODAY; and VICE MEDIA LLC,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**FEDERAL BUREAU OF INVESTIGATION,**<br><br>**Defendant.** | **Case No. 16-cv-1850 (TSC)** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Dated: February 20, 2017

Of Counsel:

Karen Kaiser
Brian Barrett
The Associated Press
450 West 33rd Street
New York, NY 10001
Telephone: (212) 621-7547
Fax: (212) 506-6131
E-mail: kkaiser@ap.org
E-mail: bbarrett@ap.org

Barbara W. Wall
Thomas Curley
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107
Telephone: (703) 854-6417
Fax: (703) 854-2031
E-mail: bwall@gannett.com
E-mail: tcurley@gannett.com

LEVINE SULLIVAN KOCH & SCHULZ, LLP

Jay Ward Brown (D.C. Bar No. 437686)
1899 L Street, N.W., Suite 200
Washington, D.C. 20036
Telephone: (202) 508-1136
Fax: (202) 861-9888
E-mail: jbrown@lskslaw.com

Jeremy A. Kutner
(*Admitted Pro Hac Vice*)
321 West 44th Street, Suite 1000
New York, NY 10036
Telephone: (212) 850-6100
Fax: (212) 850-6299
E-mail: jkutner@lskslaw.com

*Counsel for Plaintiffs The Associated Press,
USA TODAY, and Vice Media LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 1

A.       The FBI's Acquisition Of The Tool To Access The iPhone ............................. 1

B.       Subsequent Official Disclosures ..................................................................... 3

C.       The USA TODAY FOIA Request .................................................................... 5

D.       The AP FOIA Request ..................................................................................... 6

E.       The Vice FOIA Request ................................................................................... 7

F.       This Action ....................................................................................................... 8

STANDARD OF REVIEW ............................................................................................... 9

ARGUMENT ................................................................................................................... 10

I.       THE FBI BEARS A HEAVY BURDEN TO JUSTIFY WITHHOLDING
         INFORMATION UNDER THE FREEDOM OF INFORMATION ACT ...................... 11

II.      EXEMPTION 1 PROVIDES NO BASIS FOR WITHHOLDING
         THE TOTAL CONTRACT PRICE OR THE IDENTITY OF THE VENDOR .............. 12

III.     NEITHER THE PURCHASE PRICE NOR THE IDENTITY
         OF THE VENDOR CONSTITUTE "INTELLIGENCE SOURCES
         OR METHODS" THAT MAY BE WITHHELD UNDER EXEMPTION 3 ................... 18

IV.      NEITHER THE PURCHASE PRICE NOR THE IDENTITY OF THE
         VENDOR WOULD POSE SUBSTANTIAL COMPETITIVE HARM
         UNDER EXEMPTION 4 ................................................................................... 21

V.       THE FBI HAS FAILED TO SHOW THAT THE PRICE AND
         VENDOR IDENTITY WOULD DISCLOSE LAW ENFORCEMENT
         TECHNIQUES AND RISK CIRCUMVENTION OF THE LAW UNDER
         EXEMPTION 7(E) ........................................................................................... 28

CONCLUSION ............................................................................................................... 32

i

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*ACLU v. CIA*,
   892 F. Supp. 2d 234 (D.D.C. 2012) ...............................................................................18

*ACLU v. DOD*,
   628 F.3d 612 (D.C. Cir. 2011) .....................................................................................12

*ACLU v. Office of the Dir. Of Nat'l Intelligence*,
   2011 WL 5563520 (S.D.N.Y. Nov. 15, 2011) ...................................................13, 14

*Albuquerque Publ'g Co. v. DOJ*,
   726 F. Supp. 851 (D.D.C. 1989) ..................................................................................28

*Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*,
   626 F.3d 678 (2d Cir. 2010) ...................................................................................28, 29

*Am. Immigration Council v. Dep't of Homeland Sec.*,
   950 F. Supp. 2d 221 (D.D.C. 2013) ...............................................................................9

*\*Biles v. Dep't of Health & Human Servs.*,
   931 F. Supp. 2d 211 (D.D.C. 2013) ...............................................................21, 22, 26

*\*Blackwell v. FBI*,
   646 F.3d 37 (D.C. Cir. 2011) .................................................................................28, 29

*\*Boeing Co. v. Dep't of the Air Force*,
   616 F. Supp. 2d 40 (D.D.C. 2009) ........................................................................23, 26

*Canadian Commercial Corp. v. Dep't of the Air Force*,
   514 F.3d 37 (D.C. Cir. 2008) .................................................................................24, 26

*Center for Public Integrity v. DOE*,
   191 F. Supp. 2d 187 (D.D.C. 2002) .......................................................................22, 24

*\*CIA v. Sims*,
   471 U.S. 159 (1985) .....................................................................................................18

*Citizens for Responsibility & Ethics in Wash. v. DOJ*,
   160 F. Supp. 3d 226 (D.D.C. 2016) .............................................................................31

*Coldiron v. DOJ*,
   310 F. Supp. 2d 44 (D.D.C. 2004) ...............................................................................13

*Critical Mass Energy Project v. NRC*,
   975 F.2d 871 (D.C. Cir. 1992) (en banc) .....................................................................22

*DOJ v. Reporters Committee for Freedom of the Press*,
  489 U.S. 749 (1989).................................................................................10, 23, 24

*Families for Freedom v. U.S. Customs & Border Protection*,
  797 F. Supp. 2d 375 (S.D.N.Y. 2011).......................................................................29

*\*Gardels v. CIA*,
  689 F.2d 1100 (D.C. Cir. 1982) ...........................................................................12, 19

*Gen. Elec. Co. v. Dep't of the Air Force*,
  648 F. Supp. 2d 95 (D.D.C. 2009) ............................................................................26

*\*Goldstein v. Office of Indep. Counsel*,
  1999 WL 570862 (D.D.C. July 29, 1999).............................................................28, 31

*Halperin v. CIA*,
  629 F.2d 144 (D.C. Cir. 1980) ..................................................................................19

*Halpern v. FBI*,
  181 F.3d 279 (2d Cir. 1999).................................................................................13, 14

*In Defense of Animals v. USDA*,
  656 F. Supp. 2d 68 (D.D.C. 2009)........................................................................22, 23

*Judicial Watch, Inc. v. Dep't of the Treasury*,
  796 F. Supp. 2d 13 (D.D.C. 2011) ............................................................................11

*Judicial Watch, Inc. v. DOD*,
  715 F.3d 937 (D.C. Cir. 2013) .............................................................................12, 13

*King v. DOJ*,
  830 F.2d 210 (D.C. Cir. 1987) ..................................................................................14

*Larson v. Dep't of State*,
  565 F.3d 857 (D.C. Cir. 2009) ..........................................................................9, 10, 19

*Leopold v. CIA*,
  106 F. Supp. 3d 51 (D.D.C. 2015) ............................................................................20

*\*Leopold v. DOJ*,
  130 F. Supp. 3d 32 (D.D.C. 2015) ............................................................................15

*\*Martin Marietta Corp. v. Dalton*,
  974 F. Supp. 37 (D.D.C. 1997)......................................................................12, 22, 23, 27

*Mayer Brown LLP v. IRS*,
  562 F.3d 1190 (D.C. Cir. 2009) ................................................................................29

*McDonnell Douglas Corp. v. Dep't of the Air Force,*
  375 F.3d 1182 (D.C. Cir. 2004) .............................................................22, 23, 24

*McDonnell Douglas Corp. v. NASA,*
  895 F. Supp. 316 (D.D.C. 1995) ......................................................................22

*McDonnell Douglas Corp. v. Widnall,*
  57 F.3d 1162 (D.C. Cir. 1995) .........................................................................24

*Military Audit Project v. Casey,*
  656 F.2d 724 (D.C. Cir. 1981) .........................................................................17

*Milner v. Dep't of the Navy,*
  562 U.S. 562 (2011) .........................................................................................11

*N.Y. Times Co. v. DOJ,*
  756 F.3d 100 (2d Cir. 2014) .......................................................................15, 16

*Nat'l Archives & Records Admin. v. Favish,*
  541 U.S. 157 (2004) .........................................................................................11

*Nat'l Parks & Conservation Ass'n v. Morton,*
  498 F.2d 765 (D.C. Cir. 1974) .........................................................................22

*NLRB v. Robbins Tire & Rubber Co.,*
  437 U.S. 214 (1978) .........................................................................................11

*Occidental Petroleum Corp. v. SEC,*
  873 F. 2d 325 (D.C. Cir. 1989) ........................................................................26

*PHE, Inc. v. DOJ,*
  983 F2d 248 (D.C. Cir. 1993) ..........................................................................31

*Phillippi v. CIA,*
  546 F.2d 1009 (D.C. Cir. 1976) .......................................................................11

*Pub. Citizen Health Research Grp. v. FDA,*
  704 F.2d 1280 (D.C. Cir. 1983) .......................................................................23

*Pub. Citizen, Inc. v. OMB,*
  598 F.3d 865 (D.C. Cir. 2010) .........................................................................11

*Pub. Citizen v. Dep't of Health & Human Servs.,*
  975 F. Supp. 2d 81 (D.D.C. 2013) ......................................................23, 25, 26, 27

*Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n,*
  740 F.3d 195 (D.C. Cir. 2014) .........................................................................28

iv

*Sennett v. DOJ*,
   962 F. Supp. 2d 270 (D.D.C. 2013) ...................................................................................14

**Statutes and Other Sources**

5 U.S.C.§ 552 ................................................................................................................ *passim*

50 U.S.C. § 3024 ................................................................................................................18

Executive Order 13256,
   75 Fed. Reg. 707 ...............................................................................................12, 13, 16

Fed. R. Civ. P. 56(a) .............................................................................................................9

Plaintiffs The Associated Press ("AP"), Gannett Satellite Information Network d/b/a USA TODAY ("USA TODAY"), and Vice Media, LLC ("Vice") (together, "News Organizations") respectfully submit this Memorandum of Points and Authorities in support of their Cross-Motion for Summary Judgment and in opposition to Defendant Federal Bureau of Investigation's Motion for Summary Judgment.

## INTRODUCTION

This action under the Freedom of Information Act ("FOIA") results from efforts of the News Organizations to uncover two basic pieces of information about one of the FBI's most controversial recent actions: the identity of and the amount of money paid to the party that, the FBI has openly acknowledged, sold to the FBI a tool to break the security protections of at least one model of the iPhone.  In this regard, it is important to emphasize, the News Organizations are *not* here seeking most of what the FBI contends was properly withheld from the public, including information concerning how the tool works or the identities of any individuals involved.[1]  Because there is no adequate justification under FOIA for withholding the two pieces of information the News Organizations seek here, the Court should order the FBI to disclose the relevant portions of the responsive records.

## STATEMENT OF FACTS

**A.     The FBI's Acquisition Of The Tool To Access The iPhone**

In early December, 2015, 14 people were killed and 22 people were seriously injured when Syed Rizwan Farook and his wife, Tashfeen Malik, opened fire on innocent civilians at the Inland Regional Center in San Bernardino, California.  *See* Government's Motion to Compel

---

[1] The News Organizations limit their argument here to the two specific pieces of information that are actually at issue in this litigation (and for that reason Exemptions 6 and 7(C) are irrelevant), but that should not be taken in other contexts as a concession that the FBI's arguments for withholding the other information are correct on the merits.

Apple Inc. to Comply, *In the Matter of the Search of an Apple iPhone Seized During the Execution of a Search Warrant on a Black Lexus IS300, California License Plate 35KGD203*, No. 5:16-cm-10-SP (C.D. Cal. Feb. 19, 2016) ("All Writs Act Proceeding"), Dkt. No. 1 at 6.[2, 3] Farook and Malik were both killed in the aftermath of the attack, which was soon defined as an act of terrorism by President Obama. *Id.* at 9.[4] While evidence quickly emerged that Malik had sworn allegiance to the Islamic State prior to the mass killings, the two assailants appear to have acted alone and had no connection to any foreign terrorist groups.[5] The terrorist act prompted immense public concern, particularly in light of the attackers' outwardly normal lives and their selection of vulnerable civilian targets.

During the course of the FBI's investigation into the attack, it obtained an iPhone issued to Farook by his government employer. All Writs Act Proceeding, Dkt. No. 1 at 10. However, because that iPhone was protected by a password – a common security feature available to millions of iPhone owners – the FBI was unable to retrieve the phone's contents without risking the integrity of the protected information. *Id.* at 10-11. Because the FBI regarded the information contained on the phone as potentially important to its investigation, it asked Apple to assist it in circumventing the password protection. *Id.* at 11. When Apple refused, the FBI took the drastic step of obtaining a federal court order under the All Writs Act directing the company

---

[2] *See also* Martin Rogers, Brad Heath & Doug Stanglin, *Shooters may have had links to radical ideology*, USA TODAY (Dec. 3, 2015),  Declaration of Jay Ward Brown ("Brown Decl."), Ex. A.

[3] For documents filed with a court, page references are to the ECF pagination unless otherwise noted.

[4] *See also* Gardiner Harris & Michael D. Shear, *Obama Says of Terrorist Threat: 'We Will Overcome It,'* N.Y. Times (Dec. 6, 2015), Brown Decl., Ex. B.

[5] *See* Brown Decl., Exs. A, B; Amanda Lee Myers & Tami Abdollah, *FBI investigates Southern California attack as act of terror*, Associated Press (Dec. 5, 2015), Brown Decl., Ex. C; Doug Stanglin & Kevin Johnson, *FBI: No evidence San Bernardino killers were part of a cell*, USA TODAY (Dec. 4, 2015), Brown Decl., Ex. D.

to assist the agency in obtaining access to the phone.  *Id*.  When Apple continued to resist, the

government moved to compel Apple to comply with the order.  *Id*. at 12-13.

The ensuing legal battle sparked an intense and extensive public debate.[6]  At issue was

not only whether the FBI would be able to adequately obtain evidence to fully investigate an act

of terrorism, but also whether a private company should be required to weaken the security

protections on its own products.  Apple itself vehemently argued that any circumvention of

iPhone security features in a single device would inevitably compromise the security of all phone

owners, and would invite future use of such techniques by the FBI.  Apple Inc.'s Motion to

Vacate Order, All Writs Act Proceeding, Dkt. No. 16 at 13.  Dozens of amici curiae flooded the

court with arguments pro and con.  *See, e.g.,* All Writs Act Proceeding, Dkt. Nos. 25-45.

The government unexpectedly moved to stay the proceedings on the basis that "an

outside party [had] demonstrated to the FBI a possible method for unlocking Farook's iPhone.

Testing is required to determine whether it is a viable method that will not compromise data on

Farook's iPhone.  If the method is viable, it should eliminate the need for the assistance from

Apple . . . set forth in the All Writs Act Order in this case."  All Writs Act Proceeding, Dkt. No.

191 at 3.  On March 28, 2016, the government confirmed it was able to access Farook's iPhone

data, and the original Order directing Apple to assist the FBI was vacated the next day.  All Writs

Act Proceeding, Dkt. Nos. 209, 210.

**B.** **Subsequent Official Disclosures**

Having used their newly acquired tool to access Farook's phone data, federal law

---

[6] *See, e.g.,* Elizabeth Weise, *Apple v. FBI timeline: 43 days that rocked tech*, USA TODAY
(Mar. 30, 2016) (collecting coverage and summarizing history of debate), Brown Decl., Ex. E.

enforcement officials confirmed that the data revealed no links to foreign terrorist organizations.[7]

FBI Director James Comey then engaged in widespread public defense of his agency's actions, confirming to reporters, on the record, significant details about the tool's purchase.  Specifically, on April 21, 2016, Comey was asked about the cost of the iPhone access tool by a reporter at a public forum.  Comey responded, "A lot . . . .  More than I will make in the remainder of this job, which is seven years and four months, for sure."[8]  Comey continued, explaining that this payment was, "in my view, worth it, because it's a tool that will help us with a 5C with iOS9."[9] *Id*.  This statement set off a flurry of news reports that estimated, based on Comey's publicly-available salary data, a sales prices for the iPhone access tool of between $1 million and $1.3 million.[10]

Comey again discussed the iPhone access tool directly at a briefing for reporters on May 11, 2016.  In his briefing, the FBI Director addressed the specifics of the iPhone access tool in even greater detail:

a. **Cost:**  In response to a question about the cost of the tool, Comey responded: "I probably shouldn't have been cute trying to estimate for you how much it costs. It costs a lot of money. . . . In my view it was well worth it."

b. **Reason for Not Specifying Amount Paid:**  In response to a question about why Comey would not be more precise about the cost of the tool, he responded: "A variety of reasons that I don't want to get into.  I'm not comfortable giving you the precise number."  Comey later added that "I don't want to waste your tax payers money."

---

[7] See, e.g., Ellen Nakashima & Adam Goldman, *No links to foreign terrorists found on San Bernardino iPhone so far, officials say*, Wash. Post (Apr. 14, 2016), Brown Decl., Ex. F.

[8] See, e.g., Joshua Kopstein, *FBI Director: We Paid More Than $1.2 Million for San Bernardino iPhone Hack*, Vice Motherboard (Apr. 21, 2016), Brown Decl., Ex. G.

[9] The iOS9 is a version of the operating system software on iPhones.

[10] Brown Decl. Ex. G; *see also FBI head suggests agency paid more than $1M to access iPhone*, Associated Press (Apr. 21, 2016), Brown Decl., Ex. H.

   c.    **Lack of Use in Other Cases:**  In response to a question whether the tool had been used in other cases, Comey responded: "I don't think we have yet.  We're trying to figure out a mechanism where we can use the tool to help in other investigations.  Again, it's a narrow thing which is a 5C operating at on [sic] iOS 9 system.  We're trying to figure out how we can help state and local law enforcement, if they have a court order.  How we can do that and still maintain the viability of the tool.  That work is underway right now.  I expect in the near future we'll have figured out how we're going to do it.  Then we'll tell local law enforcement, 'If you send us a phone here are the rules.'  Look, I want to make sure that if there are ways to use it in appropriate cases we do, but I don't think we've used it yet."

   d.    **Complete Absence of Target Investigations that Would Use Technology:**  In response to a question about how widely the tool could be used on other types of phones, Comey responded: "My recollection is we're highly confident that it works only on a 5C, running on iOS9."  When asked whether any of the roughly 500 additional phones the FBI has identified as important to other investigations but which are currently locked and inaccessible are iPhone 5Cs running iOS9, Comey responded: "I think, and you can get the answer on this, I think the answer is none.  I don't think any in that set … I think that's right[.]"

   e.    **Structure of the Purchasing Contract:**  In response to a question about whether the FBI was avoiding an internal government process (called "VEP") for vetting whether security vulnerabilities discovered by government agencies should be disclosed to companies for public security reasons by purchasing only a tool, as opposed to the details of the security vulnerability information itself, Comey responded: "Sometimes you can buy the guts of the tool, right?  The software behind it, the code behind it.  There's a difference between those two things.  Our goal, I know you've all heard me say this many times, the goal in San Bernardino was to investigate the case and get into that phone.  We bought what was necessary to get into that phone.  We tried not to spend more money than we needed to spend, but we spent the money we needed to to get into that phone.  We did not in any form or fashion, structure the transaction of the thing with an eye towards avoiding the VEP.  I would be shocked if anybody even thought about the VEP or the VEP at the time this was going on.  We bought what we needed to buy, to get into the phone."

See Brown Decl., Ex. I (Director Comey Remarks During May 11 'Pen and Pad' Briefing with

Reporters, FBI Press Release (May 14, 2016)).

## C.    The USA TODAY FOIA Request

   On March 29, 2016, the day after the All Writs Act Order was vacated, USA TODAY

reporter Brad Heath filed a FOIA request (the "USA TODAY Request") with the FBI.  The USA

TODAY Request sought "[c]omplete copies of any records memorializing agreements or expenditures to the 'outside party' that assisted the FBI in unlocking Syed Rizwan Farook's iPhone."  Decl. of David M. Hardy in Support of Mot. for Summ. J., Dkt. 14-2 ("Hardy Decl."), Ex. A.[11]

On June 6, 2016, the FBI denied the USA TODAY Request.  Hardy Decl., Ex. C.  The FBI stated in its denial that, while it had located responsive records, it would withhold them from disclosure.  *Id.*  The FBI conclusorily cited a single FOIA exemption, Exemption 7(A), 5 U.S.C. § 552(b)(7)(A), which permits agencies to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with law enforcement proceedings . . ."  *Id.*  The FBI made no effort to explain the basis of its decision to invoke this exemption.  *Id.*

USA TODAY timely appealed the denial, arguing that Exemption 7(A) was plainly inapplicable as Farook and his wife were both dead and the FBI had failed to identify any ongoing investigations involving the responsive records.  Hardy Decl., Ex. D.  On September 2, 2016, the FBI, through the Department of Justice Office of Information Policy, summarily denied the appeal.  *Id.*, Ex. H.  The FBI again cited Exemption 7(A), but did not explain how or why that exemption applied.  *Id.*

**D.**     **The AP FOIA Request**

On April 21, 2016, AP reporter Eric Tucker filed a FOIA request (the "AP Request") with the FBI for records functionally identical to those requested by USA TODAY.  Hardy Decl. Ex. I.  The AP Request sought: (i) "Any FBI contract, request for proposal, written arrangement or business transaction, signed between the dates of March 20, 2016 and March 22, 2016, for

---

[11] The exhibits to the Hardy Decl. are filed at Dkt. No. 14-3.

technology used to unlock the iPhone 5C used by Syed Rizwan Farook"; and (ii) "Alternatively, any record of payment, receipt, etc., that the FBI or U.S. government or any entity acting on its behalf made for [the] technique." *Id.*  As with the USA TODAY Request, the AP Request sought only the financial agreements underlying the business transaction to obtain the iPhone access tool, not the details of the technology itself. *Id.*

On May 11, 2016, the FBI denied the AP Request on the same conclusory basis it had asserted in response to the USA TODAY Request.  Hardy Decl., Ex. J.  The AP timely appealed, arguing that the requested information could in no way interfere with ongoing investigations, should any actually exist. *Id.*, Ex. K.  On June 6, 2016, the government summarily denied the appeal, once again citing Exemption 7(A). *Id.*, Ex. L.

**E.      The Vice FOIA Request**

On April 21, 2016, Vice filed a FOIA request (the "Vice Request") with the FBI for "[a] copy of financial documents, including approval forms, decision analysis memorand[a], authorization documents, copies of any and all electronic check transfers, associated with the payment made by the FBI for technical assistance in accessing an iPhone that was allegedly owned by one of the suspects in the San Bernardino shooting last year."  Hardy Decl., Ex. M.[12]

On June 6, 2016, the FBI denied the Vice Request, again citing only Exemption 7(A). Hardy Decl., Ex. N.  The FBI further stated in conclusory fashion that responsive records were being withheld because they are located in an investigative file. *Id.*  Vice timely appealed the denial, *id.*, Ex. O, and the appeal was summarily denied on July 22, 2016. *Id.*, Ex. Q.

---

[12] For the purposes of this litigation, Vice has limited the scope of its Request to solely those records that also are responsive to the USA TODAY Request and the AP Request.

**F.** **This Action**

The News Organizations filed this action on September 16, 2016, alleging that the FBI had violated FOIA by failing to conduct a reasonable search and by inappropriately withholding from disclosure responsive records not subject to any FOIA exemption. *See* Compl. (Dkt. 1) at ¶¶ 32-40. The FBI filed its answer on October 24, 2016. *See* Dkt. 10.

Despite the agency's clear obligations under FOIA, in a Joint Status Report filed November 15, 2016, the FBI conceded that, "[a]t the administrative stage FBI asserted FOIA Exemption 7(a) over these records, *and did not review these records on a document-by-document basis.*" Dkt. No. 13 at 1 (emphasis added). The FBI offered no explanation as to why it failed to even attempt to segregate non-exempt material.

The parties agreed to a schedule, subsequently approved by the Court, providing for the FBI to review each of the responsive records, ostensibly for the first time. *See* Minute Order of November 21, 2016.

Despite the FBI's earlier adamant refusal to disclose *any* responsive records under Exemption 7(A), as a result of the this lawsuit, on January 6, 2017, the FBI produced 100 pages of records, many of which were heavily redacted, and withheld in full a further 23 pages. Brown Decl., Ex. J. Remarkably, the FBI has completely abandoned Exemption 7(A) as the basis for withholding and redacting the responsive records. Instead, in producing the records to the News Organizations in this litigation, the FBI has cited *six new exemptions*: Exemption 1 (relating to properly classified records), Exemption 3 (relating to records withheld pursuant to statute), Exemption 4 (relating to confidential commercial or financial information), Exemption 6 (relating to personnel files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy), Exemption 7(C) (relating to law enforcement records the disclosure of which would constitute an unwarranted invasion of personal privacy), and

8

Exemption 7(E) (relating to records that would disclose law enforcement techniques and procedures). Hardy Decl., Ex. R.

Significantly, contained within the government's initial production is a heavily redacted copy of the government's contract regarding the iPhone access tool, which specifically provides for the disclosure of "any information or data contained in a proposal that results in a contract to the extent provided under the FOIA, notwithstanding any restrictive legends that may have been placed upon it." Brown Decl., Ex. J at AP-38.

On January 30, 2017, the FBI filed its Motion for Summary Judgment. *See* Dkt. 14. Given the new evidence tendered by the FBI with that motion, the News Organizations hereby withdraw their claim that the government failed to conduct an adequate search for responsive records. Much of the government's evidence and argument concerning the redactions of the now-produced records address information that is not at issue in this litigation. On these cross-motions, there are only two discrete issues before the Court for decision: Whether FOIA requires the FBI to disclose the *identity* of the vendor and the *total price* paid to that vendor for the tool in question. As the News Organizations demonstrate below, the information is not exempt from disclosure under FOIA and the FBI should be directed to disclose both pieces of information forthwith.

## **STANDARD OF REVIEW**

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Am. Immigration Council v. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 229 (D.D.C. 2013). Summary judgment is justified when the movant establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court may grant summary judgment to the government in FOIA litigation based on information provided in agency affidavits or declarations, so long as those filings "describe the

justifications for nondisclosure with reasonably specific detail, demonstrate that the information

withheld logically falls within the claimed exemption, and are not controverted by either contrary

evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of* State, 565 F.3d

857, 862 (D.C. Cir. 2009) (citation omitted).  However, "[u]nlike the review of other agency

action that must be upheld if supported by substantial evidence and not arbitrary or capricious,

the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district

courts to 'determine the matter de novo.'" *DOJ v. Reporters Committee for Freedom of the

Press*, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

## ARGUMENT

The two limited pieces of information that remain at issue on these FOIA requests are the

types of information that are routinely disclosed in government procurement and contracting: the

parties with whom the government does business and what it pays them.  Release of this

information goes to the very heart of FOIA's purpose, allowing the public to assess government

activity—here, the decision to pay public funds to an outside entity in possession of a tool that

can compromise the digital security of millions of Americans.  The government's retroactive

invocation of Exemptions 1, 3, 4, and 7(E) to withhold these two pieces of information cannot

withstand scrutiny.  First, to the extent that the government means to argue that Exemptions 1

and 3 apply to the total price paid for the tool and to the vendor's identity, its conclusory

assertions regarding potential harm from disclosure are far from logical or plausible.  Indeed, the

FBI's Director himself has already said so much publicly about the tool in question and its

acquisition that it simply is not credible to suggest that there is any link to national security,

much less that any harm to national security might result from disclosure of the two specific

pieces of information at issue.  Second, to the extent the Government invokes Exemption 4 by

claiming that that disclosure of the total price it paid the vendor would somehow substantially

harm the vendor's competitive position, courts in this Circuit repeatedly have emphasized that the total contract price of a government procurement like that at issue here routinely should be disclosed. Finally, the government's argument that the price and identity constitute "law enforcement methods" properly withheld from disclosure pursuant to Exemption 7(E), if accepted, would impermissibly expand the scope of the exemption beyond all proper bounds.

## I.
## THE FBI BEARS A HEAVY BURDEN TO JUSTIFY WITHHOLDING INFORMATION UNDER THE FREEDOM OF INFORMATION ACT

The fundamental purpose of FOIA is to serve as "a means for citizens to know 'what their Government is up to.' This phrase should not be dismissed as a convenient formalism. It defines a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171-72 (2004) (internal marks and citations omitted). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). It is for these reasons that courts are required to review de novo an agency's claim of exemption, and FOIA's exemptions "are explicitly made exclusive, and must be narrowly construed." *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011) (internal marks and citations omitted). In conducting this de novo review, the government at all times bears "the burden to demonstrate that the documents requested are exempt from disclosure." *Judicial Watch, Inc. v. Dep't of the Treasury*, 796 F. Supp. 2d 13, 23 (D.D.C. 2011); *see also Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 869 (D.C. Cir. 2010). This requirement applies with equal force even where a government agency claims the requested information is classified, and courts demand "a detailed public justification for any claimed right to withhold a document." *Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C. Cir. 1976).

Further, while FOIA's fundamental purpose must be upheld in all areas of official action,

> [i]n perhaps no sphere of governmental activity would that purpose
> appear to be more important than in the matter of government
> contracting.  The public, including competitors who lost the business
> to the winning bidder, is entitled to know just how and why a
> government agency decided to spend public funds as it did.

*Martin Marietta Corp. v. Dalton*, 974 F. Supp. 37, 41 (D.D.C. 1997).  The information sought

here is limited to precisely this essential information about governmental activity.

## II.
## EXEMPTION 1 PROVIDES NO BASIS FOR WITHHOLDING
## THE TOTAL CONTRACT PRICE OR THE IDENTITY OF THE VENDOR

The government first seeks to withhold the limited contract-related information at issue

on the basis of Exemption 1.  To withhold information under this exemption, an agency must

demonstrate that the records at issue are "'(A) specifically authorized under criteria established

by an Executive order to be kept secret in the interest of national defense or foreign policy'" and

"'(B) are in fact properly classified pursuant to such Executive order.'"  *Judicial Watch, Inc. v.*

*DOD*, 715 F.3d 937, 940 (D.C. Cir. 2013) (quoting 5 U.S.C. § 552(b)(1)).  The relevant order

here is Executive Order 13526, 75 Fed. Reg. 707 ("EO 13526"), which sets forth "both

substantive and procedural criteria for classification."  *Judicial Watch, Inc.*, 715 F.3d at 941.

A full analysis of why the government has failed to meet its burden as to Exemption 1

necessitates a close examination of EO 13526, which sharply limits classification to only those

records that "could reasonably be expected to cause *identifiable or describable damage to the*

*national security*" and "pertain[] to" one of eight enumerated topics.  EO 13526 § 1.4; *Judicial*

*Watch*, 715 F.3d at 941.  The government's rationale in this regard must be "logical" and

"plausible."  *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982) ("[T]he issue is whether on

the whole record the Agency's judgment objectively survives the test of reasonableness, good

faith, specificity, and plausibility."); *see also ACLU v. DOD*, 628 F.3d 612, 619 (D.C. Cir. 2011).

Moreover, with respect to whether a record is "properly classified," EO 13526 requires an evaluation of the motive behind the classification itself, because classification is prohibited if its purpose is to: "(1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interest of the national security."  EO 13526 § 1.7(a).

Therefore, while an agency's decision to withhold records under Exemption 1 is typically afforded "substantial weight," its factual justification for invoking this exemption must be *logical and plausible* – no deference is owed where an agency relies on an affidavit that fails to describe "the justifications for withholding the information with specific detail," fails to "demonstrate[] that the information withheld logically falls within the claimed exemption," or is "contradicted by contrary evidence in the record or by evidence of the agency's bad faith." *Judicial Watch, Inc.*, 715 F.3d at 940-41.  The Executive's purview to classify is far from unlimited, and only the judiciary stands capable of ensuring that the Executive Order's protections against unnecessarily shielding important information from public view remain meaningful and robust.  Thus, "even in Exemption 1 situations, the court is not to be a wet blanket."  *Coldiron v. DOJ*, 310 F. Supp. 2d 44, 53 (D.D.C. 2004) ("No matter how much a court defers to an agency, its review is not vacuous." (internal marks and citations omitted)); *see also ACLU v. Office of the Dir. Of Nat'l Intelligence*, 2011 WL 5563520, at *6 (S.D.N.Y. Nov. 15, 2011) ("By proffering conclusory and nearly identical justifications for the various [ ] withholdings, the government appears to assume that *de novo* FOIA review requires little more than a judicial spell check.  Because 'blind deference is precisely what Congress rejected when it amended FOIA in 1974,' the Court finds the [Government's] Declaration insufficient to justify

13

the [agency's] withholdings under Exemption 1." (quoting *Halpern v. FBI*, 181 F.3d 279, 293 (2d Cir. 1999))); *Sennett v. DOJ*, 962 F. Supp. 2d 270, 280 (D.D.C. 2013) ("Time and again, courts in this Circuit have stressed that the government cannot justify its withholdings on the basis of summary statements that merely reiterate legal standards or offer 'far-ranging category definitions for information.'" (quoting *King v. DOJ*, 830 F.2d 210, 221 (D.C. Cir. 1987))).

As an initial matter, it is unclear whether the government is arguing that Exemption 1 applies to the price paid for the iPhone access tool. The Hardy Declaration not only limits its discussion of Exemption 1 to information that would reveal the "actual intelligence activities and methods" used by the FBI (a category that has nothing to do with the tool's price tag), it pointedly omits specific discussion of price in this context. This is in contrast to its invocation of Exemptions 4 and 7(E), which address price explicitly. *Compare* Hardy Decl. ¶ 35 (specifically stating that information "that would identify the vendor" is encompassed by the agency's Exemption 1 withholdings but making no mention of the contract price); ¶ 43 (specifically mentioning contract price in the context of Exemption 4); ¶ 58(A) (specifically mentioning amount paid in context of Exemption 7(E)); *see also* Gov't Mem. in Support of Mot. for Summ. J. ("Mem.") at 20-21.

To the extent that the FBI means to extend its rationale for invoking Exemption 1 to price, its rationale is both conclusory and illogical: According to the FBI, disclosing the requested information would "allow hostile entities to discover the current intelligence gathering methods used, as well as the capabilities and limitations of these methods. With the aid of this detailed information, hostile entities could develop countermeasures which would, in turn, severely disrupt the FBI's intelligence gathering capabilities." Hardy Decl. ¶ 36. In other words, the FBI would have this Court accept as logical that knowing the *price* of the iPhone access tool

would inexorably lead America's enemies to develop specific countermeasures, as though knowing the results of a bureaucratic bargaining process would algorithmically identify the inclusion or non-inclusion of specific coding elements in the tool itself.  While the News Organizations understand that some deference is required in complex technological matters in which the Court may not be expert, this explanation is, in a word, gossamer.  Were such predictive wizardry possible, no law enforcement-related budgeting or pricing information could ever be public without jeopardizing national security.  *See, e.g., Leopold v. DOJ*, 130 F. Supp. 3d 32, 49 (D.D.C. 2015) (ordering disclosure of portions of requested document that do not "reference or pertain to classified material").

Moreover, the FBI's Director has *already* revealed the only possible useful bit of information about the tool's price, namely, that it was very high, and that the tool therefore is likely to be somewhat sophisticated or novel.  If it were at all plausible that this nation's enemies could develop disruptive countermeasures by knowing that the government invested heavily in the tool, then that damage has already been done by Comey's confirmation that the tool cost "a lot of money," so much that it exceeds Comey's salary by at least 700 percent.  Brown Decl., Ex. G; *id.*, Ex. I at 2; *see also id.*, Ex. I at 5 (Comey explained to reporters that FBI "bought what was necessary to get into that phone.  We tried not to spend more money than we needed to spend, but we spent the money we needed to to get into that phone.").  Acceptance of the FBI's argument would also require this Court to ignore that the FBI has been exceedingly public about the fact that the tool applies only to a specific model of phone (the iPhone 5c) running a specific, and already outdated, operating system (iOS9).  *See id.*, Ex. I at 16 ("[W]e're highly confident that [the tool] works only on a 5C, running on iOS9").  Were adversaries on the hunt for actually effective countermeasures, they need only to heed Comey's public statement and simply use a

different kind of phone, or a different operating system.  *See, e.g., N.Y. Times Co. v. DOJ*, 756

F.3d 100, 120 (2d Cir. 2014) ("With the redactions and public disclosures . . . it is no longer

either 'logical' or 'plausible' to maintain that disclosure of the [requested information] risks

disclosing any aspect of 'military plans, intelligence activities, sources and methods, and foreign

relations.'" (citation omitted)).  In short, no logical and plausible basis exists for the proposition

that disclosure of the total contract price for the iPhone access tool poses a risk of harm to

national security, and the government has made no real effort to identify one.

Separately, Comey's public comments suggest that the government's true motive for

withholding the contract price is prohibited under EO 13526.  The Hardy Declaration is silent as

to the reasons behind any possible invocation of Exemption 1 as to the price of the tool. Comey,

however, was not so circumspect, telling reporters, flatly, "I don't want to waste your tax payers

money."  Brown Decl., Ex. I at 11.  But as the Executive Order makes clear, it is impermissible

to classify material to "restrain competition" or to "prevent embarrassment" to the agency.  EO

13526 § 1.7.  Withholding the purchase price artificially alters the competitive landscape for

technology contracting, restraining other entities in the field, should they exist.  Further, the

implication that the FBI fears taxpayer backlash for the size of its outlay on the tool is simply not

an acceptable basis for invoking Exemption 1 to withhold the total contract price.

With respect to the identity of the vendor, the government does specifically address why

it believes the vendor's identity properly is classified:  "identifying the specific vendor could

reveal/allow for circumvention of the intelligence activities or methods utilized.  The information

obtained about/from the intelligence activities or methods is very specific in nature, provided

during a specific time period, and known to very few individuals."  Hardy Decl. ¶ 35.  This

explanation is likewise conclusory, tautologically asserting that merely identifying the vendor

would reveal intelligence information because the vendor is in possession of intelligence information.  But this is no more logical than stating that knowing that Lockheed Martin is building F-35 fighter jets inherently reveals the specific capabilities of the jets themselves.  It is difficult to understand how knowing the vendor's identity would permit the development of countermeasures, and the government makes no effort to explain how this might be so.

It is instructive to compare the reasons for non-disclosure that the government has offered in its declaration here with those offered in *Military Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981), a case in which the CIA carried its burden of justifying the invocation of Exemption 1 to protect the identities of its contractors on a highly sensitive project to retrieve a Russian submarine from the ocean floor.  There, unlike here, the government testified that revealing the names of CIA partners would, among other things, endanger the safety of vendor personnel and prevent future intelligence sources from working with the CIA when promises of confidentiality could be overruled.  *Id*. at 739-40.  *None* of those reasons are advanced or asserted here, nor could they be, as the FBI's contract document specifically states that the agency might reveal all pertinent information, notwithstanding any expectations on the part of the vendor.  Brown Decl., Ex. J at AP-38.  Indeed, the only justification offered in the Hardy Declaration is that the name of the vendor somehow inherently reveals intelligence activities and capabilities.  *See, e.g.,* Hardy Decl. ¶¶ 34-36; Mem. at 20-21.  The FBI offers no support for this conclusory proposition, however, nor could it.  The agency, and Hardy, have extensive experience in drafting declarations addressing Exemption 1, so the pointed failure to include any of the rationales for withholding vendor identity endorsed by this Circuit speaks volumes.  As noted above, the mere fact that the government may have contracted with an entity whose identity, if

17

revealed, would cause government embarrassment, is simply not a valid reason for withholding the information.

Accordingly, the FBI has failed to carry its burden to show that the purchase price of the iPhone access tool and the vendor's identity are protected from disclosure under Exemption 1 and summary judgment should be granted to the News Organizations on this prong of their motion.

### III.
### NEITHER THE PURCHASE PRICE NOR THE IDENTITY OF THE VENDOR CONSTITUTE "INTELLIGENCE SOURCES OR METHODS" THAT MAY BE WITHHELD UNDER EXEMPTION 3

The government next argues that price and identity are properly withheld under Exemption 3. That exemption applies to records that are "specifically exempted from disclosure by statute . . . , if that statute . . . requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue . . . or establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). In order to properly invoke Exemption 3, the FBI must establish (1) that the statute at issue qualifies as an exempting statute under Exemption 3, and (2) that the material in question must be withheld under that statute. *CIA v. Sims*, 471 U.S. 159, 167 (1985).

The News Organizations do not dispute that the statute cited by the FBI, section 102A(i)(1) of the National Security Act of 1947, 50 U.S.C. § 3024(i)(1), qualifies as an exempting statute. *ACLU v. CIA*, 892 F. Supp. 2d 234, 242 (D.D.C. 2012). That statute states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure," 50 U.S.C. § 3024(i)(1).

As to the second prong of the FBI's burden under Exemption 3 – a demonstration that the withheld material must be withheld pursuant to the relevant statute – in this Circuit the FBI is

required to establish that the information it seeks to withhold "can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods," *Gardels*, 689 F.2d at 1103 (quoting *Halperin v. CIA*, 629 F.2d 144, 147 (D.C. Cir. 1980)).  In the context of section 102(A)(i)(1) – which is the relevant statute here – this means that the FBI must establish that the information at issue actually relates to intelligence sources and methods.  *Larson*, 565 F.3d at 866.

It is once again unclear whether the FBI means to argue that Exemption 3 applies to the purchase price for the iPhone access tool.  While the Hardy Declaration asserts that "the FBI has determined that intelligence sources and methods would be revealed if any of the withheld information is disclosed to Plaintiffs," the purchase price (which plainly could not reveal an intelligence "source") is nowhere specifically identified as an intelligence method or as a piece of information likely to identify one.  *See* Hardy Decl. ¶ 43; s*ee also id.* ¶ 58(A) (discussing purchase price in the context of Exemption 7(E) but never stating that price is such a method).  For this reason alone, there is no basis under Exemption 3 to withhold the purchase price from disclosure.

But the FBI's effort to sweep the two pieces of requested information within the ambit of Exemption 3 fails for two additional, critical reasons.  First, the government has made no meaningful argument, and has advanced no proof, that either the tool's purchase price or the identity of the vendor "can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods." *Gardels*, 689 F.2d at 1103.  Indeed, the Hardy Declaration is the very definition of conclusory, simply stating that all withheld material would reveal intelligence sources and methods because they would reveal intelligence sources and methods.  Hardy Decl. ¶ 40.  Rather than explain how or why this is the case, and offer the News

Organizations a meaningful opportunity to respond, the government simply relies on the generally deferential stance courts have adopted in Exemption 3 cases in the past. *See* Mem. at 22-24; *Leopold v. CIA*, 106 F. Supp. 3d 51, 57-58 (D.D.C. 2015). But a general, and prudent, judicial reluctance to override national security assessments is not the same as requiring a logical and plausible connection between the actual information withheld – the total purchase price and the vendor identity – and the intelligence sources or methods themselves. The government's failure to adduce *any* such evidence mandates rejection of its attempt to invoke Exemption 3 here.

Second, even the most generous reading of the government's propositions regarding the security implications of these specific pieces of information is illogical, particularly in light of Comey's extensive public discussion of the matter. The rationale offered by the FBI purports to link the purchase price to the *nature* of the intelligence method at issue – namely, that knowing the exact dollar amount of the price will permit the development of countermeasures. Mem. at 23-24. This is simply not credible, particularly given the disclosed and confirmed facts that the purchase price was something over $1 million, that there is heavy institutional willingness to investigate protected phones with vigor, and that there is no need for the FBI to expend additional funds to use the tool in future investigations.

The same is also true for the identity of the vendor, which is, significantly, never claimed by the government to be itself an "intelligence source." Hardy Decl. ¶¶ 40-41. While it is undisputed that the vendor developed the iPhone access tool, the government has identified no rational reason why knowing the vendor's identity is linked in any way to the substance of the tool, much less how such knowledge would reveal any information about the tool's application. It is not the job of this Court to assume such a rationale where none has been proffered, and

summary judgment therefore should be granted to the News Organization on this prong of the motion.

## IV.
## NEITHER THE PURCHASE PRICE NOR THE IDENTITY OF THE VENDOR WOULD POSE SUBSTANTIAL COMPETITIVE HARM UNDER EXEMPTION 4

The government next seeks to improperly withhold the iPhone access tool's purchase price under Exemption 4. This exemption permits an agency to withhold from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). The parties agree that, "[f]or Exemption Four to apply, the information must (1) involve trade secrets and commercial or financial information, (2) be obtained from a person outside the government, and (3) be privileged or confidential." *Biles v. Dep't of Health & Human Servs.*, 931 F. Supp. 2d 211, 219 (D.D.C. 2013).

While once again unclear, it appears the government means to invoke Exemption 4 solely with regard to purchase price. The government asserts in its memorandum that it withheld two categories of information pursuant to Exemption 4: "(1) proprietary details of *how* the third party vendor was able to unlock Farook's iPhone and the breadth of the third party vendor's *knowledge and capabilities* in regards to the technology, and (2) the monetary compensation paid to this third party vendor in order to obtain their assistance." Mem. at 26 (emphasis added); *see also* Hardy Decl. at ¶ 44 (emphasizing that government seeks to protect vendor's capabilities so as to prevent development of countermeasures, without mentioning vendor identity). Nothing about these categories relates to the vendor's identity, which by itself conveys no information of substance.

For the purposes of this motion, the News Organizations do not dispute that the purchase price qualifies as "commercial or financial information," or that it was obtained "from a person

outside the government."  The government does not contend that this information is somehow

"privileged."  And the government has plainly failed to carry its burden to demonstrate that the

purchase price is "confidential" under the statute.

"To determine whether information is confidential, the court must first determine whether

the information was submitted to the government voluntarily or whether the government required

the information to be submitted."  *Biles*, 931 F. Supp. 2d at 219; *Critical Mass Energy Project v.*

*NRC*, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc).  The FBI concedes here, as it must, that

information submitted to obtain a government contract is an "involuntary" submission subject to

heightened proof requirements.  Mem. at 16; *McDonnell Douglas Corp. v. Dep't of the Air*

*Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004); *McDonnell Douglas Corp. v. NASA*, 895 F. Supp.

316, 318 (D.D.C. 1995) ("[P]ricing information necessary for a government contract is

considered involuntary for a FOIA exemption 4 analysis. . . . Price is an essential and required

piece of information for the contract, no matter how it was achieved."); *Martin Marietta Corp.*,

974 F. Supp. at 39.

> Under the law of this Circuit, information is 'confidential' for
> purposes of Exemption 4 if it is submitted 'involuntarily' and is
> 'likely' to 1) 'cause substantial harm to the competitive position of the
> person from whom the information was obtained', or 2) 'impair the
> government's ability to obtain necessary information in the future.'

*Center for Public Integrity v. DOE*, 191 F. Supp. 2d 187, 189-90 (D.D.C. 2002) (quoting *Nat'l*

*Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974)).

Courts in this Circuit make short work of claims that the government entity paying for

work from contractors could suffer impairment in its ability to obtain necessary information by

releasing contract details.  *See, e.g. Martin Marietta Corp.*, 974 F. Supp. at 40 ("It is highly

unlikely that [the agency's] ability to obtain such information in the future would be impaired in

the least if it releases the contracts, and [the contractor] does not argue that it will.  Government

contractors . . .  will continue bidding for [agency] contracts despite the risk of revealing business secrets if the price is right."); *In Defense of Animals v. USDA*, 656 F. Supp. 2d 68, 72 (D.D.C. 2009) ("Where the government obtains information involuntarily, disclosure does not impair the government's ability to obtain similar information in the future.").

As such, the sole issue is whether the release of the purchase price is likely to cause "substantial harm to the competitive position" of the anonymous third party vendor.  And it is well-established in this Circuit that the relevant type of "harm" is sharply limited.  "To qualify as 'substantial competitive harm,' the harm must be 'limited to harm flowing from the affirmative use of proprietary information *by competitors*.'"  *Pub. Citizen v. Dep't of Health & Human Servs.*, 975 F. Supp. 2d 81, 113-14 (D.D.C. 2013) (quoting *Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1291 & n.30 (D.C. Cir. 1983) (emphasis in original)).  Because "[c]ourts may not impose a *per se* rule that in all cases prohibits or requires the release of one particular type of information," whether the agency has met its burden to demonstrate the likelihood of substantial competitive harm "turns upon the particular facts" of the case.  *Boeing Co. v. Dep't of the Air Force*, 616 F. Supp. 2d 40, 45 (D.D.C. 2009).  "[M]erely conclusory statements about competitive harm, even if repeated numerous times, are not sufficient."  *Pub. Citizen*, 975 F. Supp. 2d at 114.  The party seeking non-disclosure "must provide 'specific factual or evidentiary material' to support his claim that harm is likely to result."  *Boeing Co.*, 616 F. Supp. 2d at 45 (citation omitted).

The FBI has not come close to demonstrating substantial competitive harm from disclosure of total contract price.  As an initial matter, courts in this Circuit have repeatedly emphasized that total or aggregate pricing information – as opposed to line-item pricing – is only in rare circumstances appropriately withheld under Exemption 4.  In *McDonnell Douglas Corp*.

*v. Department of the Air Force*, for instance, the Court of Appeals emphasized that "the total contract price paid by the government is routinely made public because that disclosure informs citizens about 'what their government is up to.'"  375 F.3d at 1193 (quoting *DOJ v. Reporters Committee For Freedom of the Press*, 489 U.S. at 773) (internal marks and citation omitted); *see also Center for Pub. Integrity*, 191 F. Supp. 2d at 194-95 (rejecting as illogical claim that disclosure of aggregate pricing data was likely to cause substantial competitive harm).

The News Organizations do not here seek specific breakdowns of the third party vendor's pricing structure – for example, the labor, installation, technological support, and product costs – just the total amount paid.  The FBI, however, appears conclusorily to argue that the price in question is a "line-item price" that should be withheld under Exemption 4.  Mem. at 25.  While courts have sanctioned in particular factual scenarios the withholding of line-item pricing data, this is only permitted where the information "reveals the internal workings of the contractor, not those of the Government."  *McDonnell Douglas Corp.*, 375 F.3d at 1193.  Moreover, judges have admonished that withholding even that information betrays "the core purpose of FOIA." *Id.* at 1194 (Garland, J., dissenting); *see also Canadian Commercial Corp. v. Dep't of the Air Force*, 514 F.3d 37, 43 (D.C. Cir. 2008) (Tatel, J., concurring) ("[I]t seems quite unlikely that Congress intended to prevent the public from learning how much the government pays for goods and services"); *McDonnell Douglas Corp. v. Widnall*, 57 F.3d 1162, 1167 (D.C. Cir. 1995) ("[T]he idea that a price charged to the government for specific goods or services could be a 'trade secret' appears passing strange to us").

Even assuming, without basis, that the purchase price at issue is somehow a "line-item" price that "reveals the inner workings of the contractor," the FBI offers no factual support for its contention that its release would cause substantial competitive harm.  Instead, the government

offers only two conclusory statements: (1) that "[r]elease of this information would enable potential government contractors with similar technology/methods the opportunity to judge how they might underbid the third party vendor who unlocked Farook's iPhone, when bidding for similar contracts in the future," and (2) "[s]eeing the FBI flippantly release proprietary secrets provided in confidence to the FBI by a third party vendor and/or the amount of money the FBI paid this vendor may dissuade future contractors from working with the FBI, from fear the FBI may publicize their own trade secrets and/or release other details about their work with [the] FBI that will cause them competitive harm."  Hardy Decl. ¶¶ 45-46.

The government offers no facts to support these assertions, and courts in this circuit have routinely rejected such conclusory declarations in support of non-disclosure.  *See, e.g. Pub. Citizen*, 975 F. Supp. 2d at 115 (rejecting as conclusory declaration stating that "public disclosure of this information, which includes non-public legal and/or regulatory actions . . . would certainly have negative commercial consequences for [the company].").

Instead, the only facts that *are* available indicate that, if anything, the third party vendor does not have any competitors at all.  The redacted production made available to the News Organizations shows that rather than engage in competitive bidding to purchase the iPhone access tool, the FBI specifically sought a waiver to solicit a single source: the unnamed third party vendor.  *See* Brown Decl., Ex. J at AP-19 – AP-23.  The FBI's own justification for avoiding open competition states that, while it

> received at least three inquiries from companies indicating an interest in developing a product for the FBI to access Farook's iPhone . . . none of these companies had begun to develop or test a solution at the time of the inquiry, and thus would not be able to produce a solution quickly enough to meet the FBI's investigative requirements.

*Id*. at AP-22. This admission demonstrates not only that the vendor has no competitors that might underbid it, but that if such competitors actually emerged, the bidding process that would result would in no way resemble that which took place here because it would no longer be a single-source submission subject to monopoly price premiums. *Id*. ("The FBI will continue to conduct market surveys to identify potential sources on subsequent acquisitions."). The purchase price, in other words, is simply not relevant to any future contract negotiation *involving competitors*, which is the only type of information protected by Exemption 4. *See Pub. Citizen*, 975 F. Supp. 2d at 113-14 ("To qualify as 'substantial competitive harm,' the harm must be 'limited to harm flowing from the affirmative use of proprietary information *by competitors*.'" (quoting *Occidental Petroleum Corp. v. SEC*, 873 F. 2d 325, 341 (D.C. Cir. 1989)). This is a far cry from the cases in which line-item prices were withheld under Exemption 4, which involved line-item prices essential to option-year contract bids subject to intense competition, *Canadian Commercial Corp.*, 514 F.3d at 42-43, or extensive factual evidence of intensive competition over commodity spare engine parts, *Gen. Elec. Co. v. Dep't of the Air Force*, 648 F. Supp. 2d 95, 102-03 (D.D.C. 2009). This is particularly true here, where the FBI's Director has already revealed substantial information about the price itself. *See Biles*, 931 F. Supp. 2d at 230 (ordering release of information under Exemption 4 where agency "has failed to provide a single non-conclusory claim that asserts anything beyond a *possibility* of *competition* and has failed to rebut [plaintiff's] nullifying evidence with affirmative, non-conclusory counter evidence." (emphasis in original)); *Boeing Co.*, 616 F. Supp. 2d at 49 (finding company had provided insufficient evidence as to how release of labor rates could cause it substantial competitive harm).

The FBI's second rationale – that release of the information will dissuade the vendor from working with the FBI in the future – likewise fails.  As courts have found time and again, "[g]overnment contractors . . .  will continue bidding for [agency] contracts despite the risk of revealing business secrets if the price is right."  *Martin Marietta Corp.*, 974 F. Supp. at 40.  This rationale is further weakened by the fact that the contract between the FBI and the vendor *explicitly warns* that the contract might be subject to future FOIA disclosures.  *See* Brown Decl., Ex. J at AP-38 ("If a request for information contained in a proposal is requested under the FOIA, the Government shall have the right to disclose any information or data contained in a proposal that results in a contract to the extent provided under the FOIA").[13]  Such warnings have been held to undercut claims that release would pose substantial competitive harm.  *See, e.g., Pub. Citizen*, 975 F. Supp. 2d at 113 (company's argument that keeping agreement details confidential was critical to company "is belied by other language included in the [agreement] . . . which makes clear that submitted information may be subject to disclosure under the FOIA . . . . [M]erely because it was important to [the company] 'that the materials [the company] would submit to [the agency]' be shielded from disclosure is not the same as saying [the company] would not have signed the [agreement] without such assurances.  [The company] never makes such an argument, nor does the defendant agency.").  There is simply no evidence of the likelihood of any such dissuasion here.  Accordingly, the FBI has failed to carry its burden of proof with respect to Exemption 4, and summary judgment should be entered in favor of the News Organizations on this prong of the motion.

---

[13] This warning stands in sharp contrast to the FBI's baseless claim that disclosure of the vendor's identity would be "flippant."  Hardy Decl. ¶ 46.  If anything, the FBI's declaration reflects that agency's thoughtless antipathy towards, and resistance to, its obligations under FOIA.  Releasing information following a FOIA lawsuit is not "flippant."  Rather, it represents compliance with a Congressional mandate.

## V.

## THE FBI HAS FAILED TO SHOW THAT THE PRICE AND VENDOR IDENTITY WOULD DISCLOSE LAW ENFORCEMENT TECHNIQUES AND RISK CIRCUMVENTION OF THE LAW UNDER EXEMPTION 7(E)

Finally, the government seeks to withhold both the total purchase price and the vendor identity under Exemption 7(E).  This exemption permits agencies to withhold

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

5 U.S.C. § 552(b)(7)(E).  "The technique or procedure must not, however, be already well known to the public."  *Goldstein v. Office of Indep. Counsel*, 1999 WL 570862, at *14 (D.D.C. July 29, 1999) (ordering disclosure of documents withheld under Exemption 7(E) where disclosure would not risk circumvention of the law and information was commonly known to public); *Albuquerque Publ'g Co. v. DOJ*, 726 F. Supp. 851, 858 (D.D.C. 1989) ("information pertaining to techniques that are commonly described or depicted in movies, popular novels, stories or magazines, or on television" including "eavesdropping, wiretapping, and surreptitious tape recording and photographing" is not properly subject to Exemption 7(E)).

In this Circuit, Exemption 7(E) applies only where disclosure of law enforcement techniques and procedures "could reasonably be expected to risk circumvention of the law." *Blackwell v. FBI*, 646 F.3d 37, 41-42 (D.C. Cir. 2011) (citation omitted); *see also Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 204 & n.4 (D.C. Cir. 2014) (acknowledging that the Second Circuit has applied the requirement for demonstrating a risk of circumvention of the law only to "guidelines," but reiterating that courts in this Circuit apply the requirement to "techniques and procedures" (citing *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.,* 626 F.3d 678, 681-82 (2d Cir. 2010))).

28

While this bar is "relatively low," an agency invoking this exemption must still "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell*, 646 F.3d at 42 (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009)).

While the News Organizations do not dispute that the purchase price for the iPhone access tool and the identity of the third party vendor were "compiled for law enforcement purposes," not only are these pieces of information not themselves law enforcement techniques or procedures, their release would do nothing to disclose law enforcement techniques and would in no way reasonably risk circumvention of the law.

First, the FBI does not explain how the total purchase price for the iPhone access tool or the identity of the vendor are law enforcement "techniques" or "procedures." *See, e.g., Families for Freedom v. U.S. Customs & Border Protection*, 797 F. Supp. 2d 375, 391 (S.D.N.Y. 2011) (holding that arrest statistics "are neither 'techniques or procedures' nor 'guidelines,' such that they could be properly exempt under 7(E)"); *Allard K. Lowenstein Int'l Human Rights Project*, 626 F.3d at 682 (relying on Webster's Dictionary to define "guidelines" as "an indication or outline of future policy or conduct," "techniques" as "a technical method of accomplishing a desired aim" and "procedures" as "a particular way of doing or going about the accomplishment of something").

Second, the release of the limited requested information would in no way risk circumvention of the law. As noted, the FBI has *already* revealed that the tool was purchased for a very substantial price, noted the tool's precise capabilities (permitting access to iPhone 5Cs running iOS9 that are protected by a password), confirmed the agency's intention to use the tool as much as possible (and even consult with local law enforcement investigations), and reiterated

the agency's primary rationale for nondisclosure was to ensure the government got a good deal in future transactions.  These revelations render incredible the FBI's sole justification for withholding the purchase price: that doing so would reveal "the value of this technology to the FBI, and would subsequently reveal its importance and/or usefulness to the FBI."  Hardy Decl. ¶ 58(A).  In addition to being implausible (Do wrongdoers really calibrate their actions based on whether an agency thinks a specific tool is "important"?), this explanation is belied and undermined by the FBI Director's own words.  What more need potential criminals learn beyond Comey's statements that, "[g]iven the prevalence of devices that we can't unlock, in law enforcement investigations, I'm sure there's going to be other court cases," and that he is "highly confident that prosecutors are going to pursue court orders to try and get into [locked] devices, where they have a search warrant," and that the FBI is

> trying to figure out how we can help state and local law enforcement, if they have a court order.  How we can do that and still maintain the viability of the tool.  That work is underway right now.  I expect in the near future we'll have figured out how we're going to do it.  Then we'll tell local law enforcement, "If you send us a phone here are the rules."

Brown Decl., Ex. I at 3-4.  There is, of course, no doubt that the tool was used successfully to access Farook's phone.

The FBI's stated rationale, that knowing the exact purchase price "would allow criminals to judge whether the FBI intended to use this technology sparingly or whether the FBI values the technology for its broad applicability in numerous future investigations," Mem. at 28 (quoting Hardy Decl., ¶ 58(A)), ignores Comey's very public statements on these very topics.  Put differently, that horse, or theory of harm, is long since out of the barn.

Similar analysis demonstrates why Exemption 7(E) does not protect the vendor's identity. The Hardy Declaration claims that

> [r]eleasing the vendor who created this technology would provide criminals a means of researching and possibly thwarting FBI efforts to use the technology in future investigations.  Knowing the identity of the vendor would allow criminals to familiarize themselves with the vendor's past work and possibly develop countermeasures for the software that proved effective in unlocking Syed Rizwan Farook's iPhone.

Hardy Decl. ¶ 58(D).  It is, however, far from clear what "countermeasures" the FBI is imagining might be deployed here other than the obvious:  Do not use an iPhone 5c and do not use iOS9, which is already abundantly clear to those potential criminals thanks again to the FBI Director's very public statements.  As Comey has emphasized at press conferences, the FBI is "highly confident that [the tool] works only on a 5C, running on iOS9."  Brown Decl., Ex. I at 16.

Moreover, the FBI has offered no support for the contention that the vendor's past work or capabilities would be evident from disclosure of the vendor's name.  Such conclusory rationales are simply insufficient to overcome FOIA's clear mandate in favor of disclosure.  *See Goldstein*, 1999 WL 570862, at *14; *see also PHE, Inc. v. DOJ*, 983 F2d 248, 252 (D.C. Cir. 1993) (rejecting as insufficient under Exemption 7(E) agency affidavit stating that release of withheld information would provide defendants a "crystal ball view of what they will face from the prosecution"); *Citizens for Responsibility & Ethics in Wash. v. DOJ*, 160 F. Supp. 3d 226, 244 (D.D.C. 2016) (rejecting as "too broad and in conflict with the Supreme Court's mandate that FOIA's exemptions should be narrowly construed" FBI declaration that releasing certain details "could enable potential targets of the FBI to assemble information about the program to reverse engineer the FBI's use and capabilities, neutralizing or significantly degrading the FBI's ability to use the technique.").

In these circumstances, the News Organizations are entitled to summary judgment on this prong of the motion as well.

## CONCLUSION

For each and all of the foregoing reasons, the Court should grant the News

Organizations' Cross-Motion for Summary Judgment, deny the FBI's Motion for Summary

Judgment, reject application of FOIA Exemptions 1, 3, 4, and 7(E) to the purchase price of the

iPhone access tool and the identity of the third party vendor that sold it to the FBI, order the FBI

to produce those portions of the responsive records containing the requested information, award

to the News Organizations their costs and reasonable attorneys' fees, and afford such other and

further relief as the Court deems proper.

Dated:  February 20, 2017
             Washington, D.C.

Of Counsel:

Karen Kaiser
Brian Barrett
The Associated Press
450 West 33rd Street
New York, NY 10001
Telephone: (212) 621-7547
Fax: (212) 506-6131
E-mail: kkaiser@ap.org
E-mail: bbarrett@ap.org

Barbara W. Wall
Thomas Curley
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107
Telephone: (703) 854-6417
Fax: (703) 854-2031
E-mail: bwall@gannett.com
E-mail: tcurley@gannett.com

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

By:      /s/ Jay Ward Brown_____
             Jay Ward Brown (D.C. Bar No. 437686)
             1899 L Street, N.W., Suite 200
             Washington, D.C. 20036
             Telephone: (202) 508-1136
             Fax: (202) 861-9888
             E-mail: jbrown@lskslaw.com

             Jeremy A. Kutner
             (*Admitted Pro Hac Vice*)
             321 West 44th Street, Suite 1000
             New York, NY 10036
             Telephone: (212) 850-6100
             Fax: (212) 850-6299
             E-mail: jkutner@lskslaw.com

             *Counsel for Plaintiffs The Associated Press, USA
             TODAY, and Vice Media LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of February, 2017, I caused the Plaintiffs' Cross-Motion for Summary Judgment, the Memorandum of Points and Authorities in Support of Plaintiffs' Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment, the Statement of Material Facts as to Which There is No Genuine Dispute, the Declaration of Jay Ward Brown and the exhibits thereto, and Proposed Order, to be filed and served electronically via the Court's ECF system upon all counsel of record.


Dated: February 20, 2017      <u>  /s/ Jay Ward Brown  </u>
              Jay Ward Brown

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE ASSOCIATED PRESS; GANNETT SATELLITE INFORMATION NETWORK LLC d/b/a USA TODAY; and VICE MEDIA LLC, **Plaintiffs,** v. FEDERAL BUREAU OF INVESTIGATION, **Defendant.** | Case No. 16-cv-1850 (TSC) |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 7(h), plaintiffs The Associated Press ("AP"), Gannett Satellite Information Network LLC d/b/a/ USA TODAY ("USA TODAY"), and Vice Media LLC ("Vice") (together, "News Organizations"), submit this Statement of Material Facts as to which There is No Genuine Issue in support of their Cross-Motion for Summary Judgment and in opposition to defendant Federal Bureau of Investigation's Motion for Summary Judgment.[1]

1.       On April 21, 2016, FBI Director James Comey conducted an interview regarding, in part, the cost of the iPhone access tool.  Declaration of Jay Ward Brown ("Brown Decl."), Ex. G.  The quotations attributed to Comey in Exhibit G to the Brown Declaration accurately report the statements that Comey made to the public on the occasion in question.

2.       On May 11, 2016, Comey conducted a briefing with reporters in which he discussed various aspects of the iPhone access tool.  Brown Decl., Ex. I.  The quotations

---

[1] As this Statement applies to both plaintiffs' Cross-Motion for Summary Judgment and their opposition to defendant's Motion for Summary Judgment, plaintiffs here present the uncontested material facts in full.  To the extent that a separate response to defendant's Statement, Dkt. 14-4, is necessary, plaintiffs acknowledge as uncontested paragraphs 1-18 of that Statement.

1

attributed to Comey in Exhibit I to the Brown Declaration accurately report the statements that Comey made to the public on the occasion in question.

3.      By letter dated March 29, 2016, USA TODAY submitted a FOIA request (the "USA TODAY Request") to the FBI seeking "[c]omplete copies of any records memorializing agreements or expenditures to the 'outside party' that assisted the FBI in unlocking Syed Rizwan Farook's iPhone."  Declaration of David M. Hardy ("Hardy Decl.") (Dkt. No. 14-2), Ex. A.[2]

4.      By letter dated June 6, 2016, the FBI denied the USA TODAY Request, stating that the requested material was located in an investigative file exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A).  The FBI further stated that the requested records "are law enforcement records; there is a pending or prospective law enforcement proceeding relevant to these responsive records, and release of the information in these responsive records could reasonably be expected to interfere with enforcement proceedings."  The FBI did not specify the enforcement proceeding to which it was referring.  Hardy Decl., Ex. C.

5.      By letter dated June 20, 2016, and received via email dated June 21, 2016 by the Department of Justice's Office of Information Policy ("OIP"), USA TODAY appealed the FBI's June 6, 2016 denial of its request pursuant to Exemption 7(A).  Hardy Decl., Ex. D.

6.      By letter dated September 2, 2016, OIP affirmed the FBI's denial of the USA TODAY Request.  Hardy Decl., Ex. H.

7.      By email sent April 21, 2016, AP submitted a FOIA request (the "AP Request") to the FBI seeking (1)"[a]ny FBI contract, request for proposal, written arrangement or business transaction, signed between the dates of March 20, 2016 and March 22, 2016, for technology used to unlock the iPhone 5C used by Syed Rizwan Farook" and (2) "Alternatively, any record

---

[2] Exhibits to the Hardy Decl. were filed as Dkt. No. 14-3.

of payment, receipt, etc., that the FBI or U.S. government or any entity acting on its behalf made for technique." Hardy Decl., Ex. I.

8.      By letter dated May 11, 2016, the FBI denied the AP Request, stating that the requested material was located in an investigative file exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A). The FBI further stated that the requested records "are law enforcement records; there is a pending or prospective law enforcement proceeding relevant to these responsive records, and release of the information in these responsive records could reasonably be expected to interfere with enforcement proceedings." The FBI did not specify the enforcement proceeding to which it was referring. Hardy Decl., Ex. J.

9.      By letter dated June 1, 2016, AP appealed the FBI's May 11, 2016 denial of its request pursuant to Exemption 7(A). Hardy Decl., Ex. K.

10.     By letter dated June 6, 2016, OIP affirmed the FBI's denial of the AP Request. Hardy Decl., Ex. L.

11.     By email sent April 21, 2016, Vice submitted a FOIA request to the FBI (the "Vice Request") seeking "[a] copy of financial documents, including approval forms, decision analysis memorand[a], authorization documents, copies of any and all electronic check transfers, associated with the payment made by the FBI for technical assistance in accessing an iPhone that was allegedly owned by one of the suspects in the San Bernardino shooting last year." Hardy Decl., Ex. M.

12.     By letter dated June 6, 2016, the FBI denied the Vice Request stating that the requested material was located in an investigative file exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A). The FBI further stated that the requested records "are law enforcement records; there is a pending or prospective law enforcement proceeding relevant to these

responsive records, and release of the information in these responsive records could reasonably be expected to interfere with enforcement proceedings."  The FBI did not specify the enforcement proceeding to which it was referring.  Hardy Decl., Ex. N.

13.     By electronic submission via the OIP online portal on June 13, 2016, Vice appealed the FBI's June 6, 2016 denial of its request pursuant to Exemption 7(A).  Hardy Decl., Ex. O.

14.     By letter dated July 22, 2016, OIP affirmed the FBI's denial of the Vice Request. Hardy Decl., Ex. Q.

15.     For the purposes of this litigation, Vice has limited the scope of the Vice Request to solely those records also responsive to the USA TODAY Request and the AP Request.  *See* Compl. ¶ 28 n.9.

16.     On November 15, 2016, the parties filed a joint status report.  That report stated that "[a]t the administrative stage FBI asserted FOIA Exemption 7(a) over these records, and did not review these records on a document-by document basis."  Joint Status Report (Dkt. No. 13) at 1.

17.     By letters dated January 6, 2017, the FBI identified 123 responsive pages to the various requests, withheld 23 pages in full, and released 100 pages in full and in part to the News Organizations.  The FBI stated that information had been withheld pursuant to FOIA Exemptions 1, 3, 4, 6, 7(C), and 7(E).  No documents were withheld pursuant to Exemption 7(A).  Hardy Decl., Ex. R.

18.     The released records include a "Sole Source Justification, Justification for Other than Full and Open Competition in Accordance with 41 U.S.C. 3304(a)(6)" document produced by the FBI Finance Division Procurement Section that states: "The FBI received at least three

inquiries from companies indicating an interest in developing a product for the FBI to access

Farook's iPhone.  However, none of these companies had begun to develop or test a solution at

the time of the inquiry, and thus would not be able to produce a solution quickly enough to meet

the FBI's investigative requirements."  That document also states: "The FBI will continue to

conduct market surveys to identify potential sources on subsequent acquisitions."  Brown Decl.,

Ex. J at AP-22.

19.     The released records include a "Terms and Conditions" document that states: "If a

request for information contained in a proposal is requested under the FOIA, the Government

shall have the right to disclose any information or data contained in a proposal that results in a

contract to the extent provided under the FOIA, notwithstanding any restrictive legends that may

have been placed upon it in accordance with the provision at Far 52.215-1 (e), 'Instructions to

Offerors – Competitive Acquisitions'."  Brown Decl., Ex. J at AP-38.

Dated:  February 20, 2017
    Washington, D.C.

Of Counsel:

Karen Kaiser
Brian Barrett
The Associated Press
450 West 33rd Street
New York, NY 10001
Telephone: (212) 621-7547
Fax: (212) 506-6131
E-mail: kkaiser@ap.org
E-mail: bbarrett@ap.org

Barbara W. Wall
Thomas Curley
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107
Telephone: (703) 854-6417
Fax: (703) 854-2031
E-mail: bwall@gannett.com
E-mail: tcurley@gannett.com

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

By:  /s/ Jay Ward Brown
    Jay Ward Brown (D.C. Bar No. 437686)
    1899 L Street, N.W., Suite 200
    Washington, D.C. 20036
    Telephone: (202) 508-1136
    Fax: (202) 861-9888
    E-mail: jbrown@lskslaw.com

    Jeremy A. Kutner
    (*Admitted Pro Hac Vice*)
    321 West 44th Street, Suite 1000
    New York, NY 10036
    Telephone: (212) 850-6100
    Fax: (212) 850-6299
    E-mail: jkutner@lskslaw.com

*Counsel for Plaintiffs The Associated Press, USA TODAY, and Vice Media LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of February, 2017, I caused the Plaintiffs' Cross-Motion for Summary Judgment, the Memorandum of Points and Authorities in Support of Plaintiffs' Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment, the Statement of Material Facts as to Which There is No Genuine Dispute, the Declaration of Jay Ward Brown and the exhibits thereto, and Proposed Order, to be filed and served electronically via the Court's ECF system upon all counsel of record.


Dated: February 20, 2017         _____/s/ Jay Ward Brown_____
                                               Jay Ward Brown