IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATED PRESS, ET AL,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT<br>OF JUSTICE,<br><br>Defendant. | Civ. Action No. 1:16-cv-01850-TSC |

## SECOND DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1) I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), in Winchester, Virginia. I have held this position since August 1, 2002. Prior to my joining the Federal Bureau of Investigation ("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2) In my official capacity as Section Chief of RIDS, I supervise approximately 251 employees who staff a total of ten (10) Federal Bureau of Investigation Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and

1

information pursuant to the FOIA as amended by the OPEN Government Act of 2007 and the OPEN FOIA Act of 2009; the Privacy Act of 1974; Executive Order 13,526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order 13,526,[1] and the preparation of declarations in support of Exemption 1 claims asserted under the FOIA. I have been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to Executive Order 13,526, §§ 1.3 and 3.1. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3) Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to Plaintiffs' requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552. Specifically, I am aware of the FBI's handling of each of the FOIA requests submitted by the Plaintiffs to FBIHQ, seeking access to records related to the FBI's unlocking of the San Bernardino shooter's iPhone.

(4) This Declaration in being filed to supplement my first declaration justifying the FBI's handling of Plaintiffs' FOIA requests (*See* Docket No. 14, Attachment No. 2) and in response to Plaintiffs' Cross Motion for Summary Judgment. (*See* Docket No. 16.)

## PLAINTIFFS' NARROWED CHALLENGES

(5) In Plaintiffs' Cross Motion for Summary Judgment, Plaintiffs limit their challenges of FBI withholdings to "the identity of and the amount of money paid to the party

---

[1] 75 Fed. Reg. 707 (2010).

Case 1:16-cv-01850-TSC Document 17-1 Filed 03/13/17 Page 3 of 11

that, the FBI has openly acknowledged, sold to the FBI a tool to break the security protections of at least one model of iPhone." (*See* Docket No. 16, page 1.). Plaintiff challenges the applicability of the FBI's assertions of FOIA Exemptions (b)(1), (b)(3), (b)(4), and (b)(7)(E) to withhold this information.

### *Protection of the Identity of the Third Party Vendor*

(6) The FBI asserted FOIA Exemptions 1, 3, and 7E, 5 U.S.C. §§ 552 (b)(1), (b)(3), and (b)(7)(E), to protect the identity of the third party vendor because release of this information would reveal classified intelligence activities (including covert action), intelligence sources, or methods (E.O. 13,526, § 1.4(c)); intelligence sources and methods requiring withholding per the National Security Act of 1947 (50 U.S.C. § 3024 (i)(1)); and techniques and procedures for law enforcement investigations, the release of which would allow for circumvention of the law.

Applicability of Exemptions 1, 3, and 7E to Protect the Identity of the Third Party Vendor

(7) Plaintiffs claim the FBI has failed to explain how release of the vendor's identity "could reasonably be expected to cause identifiable or describable damage to the national security." (*See* Docket No. 16, page 12.) In my previous declaration, I explained that I determined the "intelligence activities or methods withheld in this case are still used by and/or useful to the FBI today to gather intelligence information" and "disclosure of this information could reasonably be expected to cause serious damage to national security as it would allow hostile entities to discover the current intelligence gathering methods used, as well as the capabilities and limitations of these methods." (*See* Hardy Declaration, ¶36.) I have determined that this holds true in regards to the iPhone unlocking technology obtained by the FBI; the vendor identity is properly classified as it pertains to intelligence sources and method. In order

to fully protect this classified intelligence gathering method, the FBI must continue to protect the identity of the vendor who created the technology.

(8) When creating proprietary software, it is reasonable to assume that software companies are more likely to expand and update previous versions of their existing computer programs rather then start from scratch. For example, when creating operating systems for personal computers ("PCs"), software companies tend to update and modernize their old operating systems rather than create a completely new product; thus, software companies develop programming styles and strategies unique to their own company as they build upon their existing work and develop new products. The same could likely be said for the vendor the FBI has redacted in the responsive documents at issue. Revealing the vendor's identity immediately provides those wishing to circumvent the iPhone unlocking technology with a body of work from the company (any existing public technology created by the company) to review and probe for possible weaknesses. They may then apply any knowledge gained through such a review to develop exploits for the vendor's unique product. This could allow them to create better encryption technology, thwart the iPhone unlocking technology currently available to the FBI, and deprive the FBI of a critical classified intelligence source and method.

(9) Additionally, revealing the vendor's identity immediately exposes the vendor to attacks and infiltration by hostile entities wishing to exploit the technology they provided to the FBI. While FBI computer networks are protected by sophisticated cyber-security measures and FBI facilities are protected by armed guards and/or sophisticated physical security measures, the vendor likely does not have the same resources to devote to its own security. With this in mind, the FBI would be taking a substantial risk to the continued viability of this technology by acknowledging the vendor. Since the same proprietary technology now owned by the FBI is also

stored within the vender's facilities and computer systems, the security of this technology would only be as good as the vendor's own security measures. It is reasonable to conclude that they would not be able to thwart the same types of attacks and infiltration attempts the FBI is currently able to defend against; thus, revealing the vendor's identity may provide hostile enemies with a softer target for attack and infiltration, and risks disclosure, exploitation, and circumvention of a classified intelligence source and method. Considering E.O. 13,526, § 1.4(c), and 50 U.S.C. § 3024 (i)(1) prohibit the release of information that risks the harms enumerated above, it is absolutely necessary for the FBI to continue to protect the vendor's identity pursuant to FOIA Exemptions 1 and 3.

(10) Furthermore, considering the FBI is both a law enforcement and intelligence agency (*See* Hardy Declaration, ¶ 48), some of its intelligence gathering methods are also used to enforce federal laws. The FBI could potentially utilize the iPhone unlocking technology at issue in Plaintiffs' requests to pursue its law enforcement mission; thus, this technology must also be considered a law enforcement technique. As described above, releasing the vendor's identity risks circumvention of this technique. Providing criminals with the means to circumvent this technique could potentially enable them to deprive the FBI of information stored in criminals' personal cellular telephones, which in some situations could deprive the FBI of information needed to detect and/or disrupt criminal activities. Thus, the risks described above should also be considered law enforcement circumvention risks.

(11) While the identity of the vendor is not a law enforcement technique in and of itself, the vendor's identity is inexorably tied to the continued viability of the iPhone unlocking law enforcement technique, as described *supra*. Exemption 7E allows for protection of information if 1) the information consists of law enforcement records which would disclose

techniques and procedures for law enforcement investigations; and 2) such disclosure could reasonably be expected to circumvent the law. The existence of the law enforcement technique at issue has already been disclosed—the FBI has acknowledged it used a third party vendor's technology to unlock Syed Rizwan Farook's iPhone. However, the FBI has not publically explained how the technology works. As detailed above, disclosing the vendor's identity provides criminals and hostile entities avenues to discover the "how" and then to create ways to circumvent the technology. Consequently, disclosure of the vendor's identity risks circumvention of the law.

(12)   The identity of the vendor pertains to the FBI's law enforcement techniques and methods. Release of this information would constitute a reasonable expectation of the circumvention of the law if this information is released. Releasing the vendor's identity could potentially lead to criminals obtaining all publically available technology developments from this vendor, and potentially exploiting this information to locate potential leads on the investigative tool created for the FBI. Any leads obtained by adversaries through these exploits will reveal the vendor's capabilities and program sophistication by using small mosaic building blocks, and lead to understanding the scope and direction of FBI's investigatory developments. Finally, because the vendor has developed unique capabilities, identifying the vendor would reveal knowledge about the FBI's capabilities, including the specific investigatory tools and equipment used by the FBI, along with its capabilities and potential limitations.

### *Protection of the Total Amount Paid to the Vendor*

(13)   The FBI asserted FOIA Exemptions 1, 3, 4, and 7E, 5 U.S.C. §§ 552 (b)(1), (b)(3), (b)(4) and (b)(7)(E), to protect the total amount the FBI paid to the third party vendor because release would reveal classified intelligence activities (including covert action),

intelligence sources, or methods (E.O. 13,526, § 1.4(c)); reveal intelligence sources and methods requiring withholding per the National Security Act of 1947 (50 U.S.C. § 3024 (i)(1)); cause substantial harm to the competitive position of the person/company from whom the information was obtained; and/or disclose techniques and procedures for law enforcement investigations, the release of which would allow for circumvention of the law.

<u>Applicability of Exemption 4 to Protect the Total Amount Paid to the Vendor</u>

(14)   Plaintiffs argue the FBI "offers no factual support for its contention that release" of the total amount paid to the vendor "would cause substantial competitive harm." (*See* Docket No. 16, page 24.) As asserted in the original Declaration filed in this case, release of this information could reasonably be assumed to enable potential government contractors with similar technology/methods the opportunity to judge how they might underbid the third party vendor who unlocked Farook's iPhone when bidding for similar contracts in the future. (*See* Hardy Declaration, ¶ 45.) Although the contract in this instance was sought from a single source, there is no reason to believe that future contracts will be similarly limited. Should the FBI require similar technology in the future, other vendors could use this information to judge how they might underbid the vendor in question, depriving the vendor of the benefits of future contracts with the FBI. Also, considering the vendor proved unlocking these types of encrypted devices is possible, and the vendor was paid for its efforts, it is reasonable to assume that their success will spur competition. The FBI judged that in light of such a competitive threat, it could not release this information without risking competitive harm to the vendor.

(15)   Protecting the vendor's proprietary and confidential data encourages all future submitters to furnish useful commercial or financial information to the government without hesitation, and it also provides the government with an assurance that required submissions will

be reliable. Moreover, release of such proprietary financial information would have a devastating impact on the government's ability to obtain similar types of proposals for state of the art technologies contemplated for law enforcement use in the future.

<u>Applicability of Exemptions 1, 3, and 7E to Protect the Total Amount Paid to the Vendor</u>

(16) The cost of the contract is properly classified as it pertains to intelligence sources and methods. The FBI has not disclosed the specific amount it paid to the third party for the iPhone unlocking technology. Revealing the actual amount paid for this product would designate a finite value for this technology, and would allow the FBI's adversaries to reasonably determine its usefulness to the FBI—whether or not the FBI can broadly utilize this technology to access their encrypted devices. Plaintiffs contend the total purchase price is not a law enforcement technique or procedure, nor is there any foreseeable harm to national security and intelligence sources and methods should this information be released. The given cost of a contract, taken in isolation, may not be exempt pursuant to Exemptions 1, 3, and 7E; however, in this specific instance, this particular price must be considered in conjunction with the intelligence source/method and law enforcement technique to which it relates, the iPhone unlocking technology. Although the cost itself may seem innocuous, it could reveal broader FBI priorities and the source and methods of certain intelligence collection when considered in the larger context of other publicly-available information.

(17) The FBI has never revealed the full scope of intended uses for this technology, and to reveal the total price paid for the technology would allow the FBI's adversaries to assess the nature of the tool. In addition, there are a limited number of vendors offering these types of products, and so with this piece of information (the cost of the contract), adversaries could

extrapolate to identify the maturity of the vendor, the vendor itself, and the likely capabilities of the classified technology.

(18)     Revealing the specific financial allotments for technology acquisition shows where the FBI concentrates its resources for national security and criminal investigations. This information would allow these criminal entities and adversaries to judge whether they should continue to utilize their current technological security measures or dedicate further time and resources to obtaining/developing different encryption technology. The FBI is gravely concerned with the mosaic effect of releasing any of these non-public details concerning unique investigatory and intelligence gathering tools as such information would enable potential targets to carefully put together building blocks of information that would result in the degradation of the effectiveness of these tools. Thus, releasing the non-public price in conjunction with the publically acknowledged technique would alert the FBI's adversaries as to its technological capabilities and limitations, enabling them to proactively develop countermeasures to circumvent this technology.

(19)     I have determined that since the release of this information would reduce the effectiveness of a critical classified source and method, resulting in serious damage to the national security of the United States, this information is exempt from disclosure pursuant to Exemption 1 (E.O. 13,526, § 1.4(c)) and Exemption 3 (50 U.S.C. § 3024 (i)(1)). Additionally, since release would reduce the effectiveness of this technique in law enforcement investigations and may result in circumvention of the law, this information is also exempt pursuant to FOIA Exemption 7E.

## **CONCLUSION**

(20)   The FBI carefully examined its redaction of the identity of and the amount of money paid to the party that, the FBI has openly acknowledged, sold to the FBI a tool to break the security protections of at least one model of iPhone. The FBI determined this information remains exempt from disclosure pursuant to FOIA Exemptions 1, 3, 4, and 7E because if disclosed, it would: reveal classified and statutorily protected information; would reveal trade secret information; and/or would disclose techniques and procedures for law enforcement investigations. After extensive review of the documents at issue, I have determined that there is no further non-exempt information that can be reasonably segregated and released without revealing exempt information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of March, 2017.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia